FILED

CO FEB 18 PM 4:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

FEB 18 2000

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL J. KEYES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CV 99-BU-0969-S |
| ) | |
| CITY OF HOOVER, a municipal ) | |
| corporation, ) | |
| ) | |
| Defendant. ) | |

Memorandum Opinion

In this case, Plaintiff Michael J. Keyes claims that his employer, Defendant City of Hoover, Alabama ("City"), violated the Americans With Disabilities Act ("ADA" or "Act"), 42 U.S.C. §§ 12101 et seq., by requiring him to undergo a functional capacities evaluation before allowing him to return to full duties as a firefighter. Now before the Court is the City's motion for summary judgment. (Doc. No. 14). The parties have filed evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. Upon consideration, the Court concludes that the motion is due to be GRANTED.

I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled

to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II. BACKGROUND[1]

In 1985, the City hired Keyes to work as a firefighter. On December 13, 1994, he suffered an on-the-job injury to his lower back. In April 1995, Keyes consulted with an M.D., Dr. Carter Morris, who that same month performed a "microdiskectomy on L-4, L-5," a surgical procedure that required Keyes to miss six weeks of work. In June 1995, Keyes returned to work without any restrictions after being cleared to do so by Dr. Morris.

In August 1995, however, Keyes again began to experience back pain. He

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

consulted with Dr. Morris, who determined that Keyes had re-ruptured his L-4 and L-5 disks. Dr. Morris took Keyes off duty and performed another back surgery in late August 1995. On October 30, 1995, Dr. Morris signed a note indicating that Keyes would be unable to return to work as a firefighter because of its physically demanding nature. Keyes took this note to Thomas E. Bradley, Chief of the City's fire department, and Keyes informed Bradley that he did not feel that he would be able to return to full duty as a firefighter. After this second surgery, Keyes remained on an indefinite leave of absence from work. However, he kept receiving his full salary until January 1996 by utilizing sick and vacation leave, some of which was donated by his co-workers. Even after that time, though, Keyes was still considered an employee of the City, which continued to pay premiums on his employee insurance coverage.

Meanwhile, Keyes and the City litigated an action the former filed on October 27, 1995 in an Alabama state circuit court to recover workers' compensation benefits based upon his back injury. In June 1996, after that case had gone to trial but while a ruling was still pending, Keyes began to suffer additional back pain. He again went to see Dr. Morris. In July 1996, Dr. Dewey Jones and Dr. Morris performed a third back operation on Keyes, a "lumbar fusion" that hospitalized him for four days. In July and August of that year, however, Keyes' attorney in the workers' compensation case corresponded with an attorney for the City, advising that Keyes's latest surgery might allow him to return to work as a firefighter. By September, Keyes apparently was also visiting fire stations and telling various employees that he was going to be returning to work as a firefighter in the relatively near future.

Nonetheless, on September 19, 1996, the state court entered a judgment in the workers' compensation case that included finding Keyes had a "55% permanent partial disability and loss of ability to earn" because of his back injury, which implied a determination that Keyes could not resume his job as a firefighter. In holding that Keyes

was entitled to recover benefits from the City under the Alabama Workers' Compensation Act, §§ 25-5-1 et seq., Ala. Code 1975, the court rejected the City's assertions that Keyes had not been injured while working and that he was barred from recovery by his alleged failure to comply with reporting requirements.

Following the entry of judgment in the workers' compensation case, an attorney for the City sent several letters to Keyes's attorney. In one, dated September 22, 1996, the City's attorney stated that given the disability found in the workers' compensation case, it was "too soon" for Keyes to be telling other firefighters that he would be returning to full-time work. The City warned him against doing so in the future, as the City's fire department found this to be potentially "disruptive and a spark for dissension and division in the ranks." In other letters, the City indicated that it was appealing the workers' compensation judgment and suggested that the City was interested in "buying its peace" with Keyes by paying a lump sum to settle the workers' compensation claim and any other potential claims he might have, provided that he would agree to sever his employment relationship with the City. Keyes lawyer, however, responded that settlement on those terms was not acceptable, and he indicated in late October 1996 that Keyes anticipated being able to return to work in January 1997.

On December 5, 1996, Drs. Morris and Jones signed notes releasing Keyes to return to "regular" work. Morris indicated that Keyes could do so immediately, while Jones authorized Keyes to return as of January 2, 1997. Keyes took these slips to Chief Bradley on the day they were signed by the doctors. Recalling, however, that Keyes had now undergone three back surgeries and that after the second both Dr. Morris and Keyes indicated that Keyes would never be able to resume full firefighter duties, Bradley decided that Keyes should not yet be cleared to return to his former job. Instead, Bradley told Keyes that he would be contacted. Bradley took the doctors' notes to the City's Personnel Director, Karen Higgins and Bradley recommended to her that Doctors Jones

and Morris be provided with a description of the specific duties of a firefighter and have them re-assess whether Keyes was ready to return to full duties in light of that description. Just before Christmas 1996, Keyes contacted Chief Bradley and asked when he was going to be able to return to work. Bradley responded that the matter had been referred to the personnel department and "wasn't in his hands." Keyes spoke with Bradley again in early January 1997, but Bradley said that he still did not know anything.

The return-to-work slips were ultimately forwarded to the attorney representing the City in the workers' compensation case, which was then pending on appeal. On January 28, 1997, that attorney sent letters to Doctors Jones and Morris indicating that the City was in receipt of their return-to-work authorizations for Keyes, but that the City wanted to assure itself that he still could, in fact, perform full firefighting duties. To that end, the City requested each doctor to re-evaluate whether Keyes would be able to do so using the firefighter medical standards issued by the National Fire Protection Agency ("NFPA"), a copy of which was enclosed with each letter. On that same date, the City's attorney sent a letter to Dr. Michael Grabowski, who regularly provided medical services for the City regarding workers' compensation cases. Enclosing a copy of the NFPA guidelines, the letter briefly outlined Keyes's back condition and related surgeries and asked for Dr. Grabowski's advice on what steps the City should take to be sure he could perform firefighting duties.

After some initial confusion regarding whether it had actually issued a return-to-work slip to Keyes, Dr. Morris's office stated in a letter to the City's attorney dated February 21, 1997, that in order to assess whether Keyes could perform all of his job duties, he needed to have a functional capacity evaluation ("FCE"). Several days later, Doctor Jones similarly responded that a FCE was in order. In a letter dated February 26, 1997, the City's attorney contacted Keyes's attorney requesting that Keyes undergo a FCE to determine his fitness under the NFPA guidelines to return to work, pursuant to a

recommendation by Dr. Grabowski. This letter also asked whether Keyes would be willing to make an appointment in the succeeding "couple of weeks" to undergo such testing at a particular facility, Med Help.

At that point, though, Keyes, refused to undergo an FCE. There appears to be some dispute over the reason for his refusal. There is some evidence indicating that Keyes himself declined to take the test because he believed that he, rather than the City, would have to pay for it. It appears that after receiving the City's request that he be tested, Keyes or someone on his behalf spoke about making an appointment for an FCE with a representative Physical Therapy South, a facility other than the one suggested by the City's attorney. Keyes's attorney received a letter from Physical Therapy South dated March 13, 1997, indicating that its representative had spoken with Reba McFee, who worked for the City, and that she stated that the City would not pay for Keyes's FCE. However, it appears that neither Keyes or his attorney ever discussed with the City the question of who would have to pay for the FCE or told anyone working for the City that such issue was the reason for his refusal. Rather, it appears that Keyes's attorney orally expressed to the City's attorney dissatisfaction with the testing demand on the ground that it was discriminatory, in that other firefighters had been cleared to work after back surgery without the City requiring an FCE.

On May 19, 1997, the City's attorney reiterated in correspondence to his counterpart representing Keyes that the City was still interested in settling the workers' compensation claim, which was then pending on appeal, and all other potential claims, provided Keyes would be willing to end his employment relationship with the City. The letter also stated that assuming that Keyes was unwilling to do so, the City would still be seeking for him to undergo an FCE before returning to work, given that Doctors Jones and Morris had now indicated that such was reasonable course of action.

On June 17, 1997, Keyes filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC"), alleging that the City's failure to allow him to return to work unless he underwent physical testing violated the ADA. The City responded to the charge by acknowledging that it was requiring Keyes to undergo an FCE before placing him in a position where he might potentially pose a threat to the safety of himself or others, because it was concerned whether Keyes could still perform the essential functions of the job given his three back surgeries. However, the City also emphasized that it had not terminated Keyes employment and that it was still paying premiums on Keyes's employee insurance plans.

On July 11, 1997, the Alabama Court of Civil Appeals affirmed the judgment in Keyes's workers' compensation case without opinion. Subsequently, on July 28, 1997, the City's attorney sent a letter to Keyes's attorney noting that the City was not pursuing any further appeals in that case, and inquiring whether Keyes was interested in returning to work for the City. If so, the City's attorney continued, he would still have to undergo an FCE before returning to full duties. However, over the next several months, Keyes's attorney continued to take the position that Keyes would not do so, because other firefighters had been returned to work after back injuries or surgery subsequent to receiving clearance from a doctor.

On March 12, 1998, the EEOC issued a determination with respect to Keyes's ADA discrimination claim. The EEOC first recognized that the ADA specifically prohibits disability-related inquiries before an offer of employment is made by an employer. Then, the EEOC determined that there was reasonable cause to believe that the City had violated the ADA by allegedly requiring Keyes to undergo testing before offering him employment in his former position.

Notwithstanding the position taken by the EEOC, Keyes underwent an FCE and further physical agility testing on March 27, 1998. Those tests resulted in a finding that Keyes was able to return to full, active duty as a firefighter for the City. Thereafter,

Keyes returned to such duty, in which he continues to this day.

After the EEOC made its probable cause determination, it turned the case over to its Civil Rights Division, which decided not to file suit. On January 12, 1999, the EEOC issued a right-to-sue letter to Keyes, who, in turn, filed this action on April 19, 1999. The City's instant motion for summary judgment followed on January 5, 2000.

### III. DISCUSSION

Keyes argues that the City violated the ADA by requiring him to submit to an FCE before allowing him to return to active duty as a firefighter. The ADA mandates that employers "shall not discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This prohibition against discrimination includes medical examinations and inquiries. 42 U.S.C. § 12112(d)(1). In particular, the ADA provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). It is undisputed that this provision applies to the facts of this case.[2]

---

[2] The ADA's provisions regarding medical examinations and inquiries by employers differ depending upon the employment status of the person to whom the examination or inquiry is directed. As stated in the text, an employer is expressly permitted to require a medical examination or inquire of a person who is already its employee, provided that the examination or inquiry is job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A). By contrast, if the person is an applicant to whom no offer of employment has yet been extended, an employer generally may not conduct a medical examination or make inquiries concerning either whether the applicant is disabled or the nature or extent of a disability, although the employer may inquire into the ability of the applicant to perform job-related functions. 42 U.S.C. § 12112(d)(2)(A) & (B). Finally, the ADA provides that if a job applicant has been extended an offer of employment, the employer may require a medical examination prior to the commencement of employment duties, and may condition the offer of employment on the results of the

The City first argues that it is entitled to summary judgment on Keyes's claim alleging that the requirement that he undergo an FCE violated the ADA because, the City contends, Keyes cannot establish that he is disabled under the Act. It is of course true that in order to establish a prima facie case of discrimination based upon disabled status under the ADA, a plaintiff must show, among other things, that he is "disabled" within the meaning of the ADA. See, e.g., Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1226 (11th Cir. 1999); 42 U.S.C. § 12102(2). However, a number of federal courts of appeals have held that a plaintiff can bring a claim alleging a violation of the ADA's prohibitions against medical examinations and inquiries even if the plaintiff is not himself "disabled." See Cossette v. Minnesota Power & Light, 188 F.3d 964, 969-70 (8th Cir. 1999); Fredenburg v. Contra Costa County Dep't of Health Serv., 172 F.3d 1176, 1182 (9th Cir. 1999); Griffin v. Steeltek, Inc., 160 F.3d 591, 594-95 (10th Cir. 1998); Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1229 (10th Cir. 1997). The United States Court of Appeals for the Eleventh Circuit has expressly left the question open. See Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999). However, this Court concludes that it need not address the issue, because the City, the Court determines, is entitled to summary judgment on an alternate ground. See Id.

The City argues that summary judgment in its favor is warranted because its requirement that Keyes undergo an FCE before being cleared to return to active duty was

---

examination, provided that all employees are subject to such an examination, and other confidentiality requirements are met. 42 U.S.C. § 12112(d)(3).

In the instant case, in determining that there was probable cause to believe that the City violated the ADA by requiring Keyes to submit to an FCE before allowing him to return to full firefighting duties, the EEOC appears to have considered Keyes's claim as if it was a pre-employment situation covered by § 12112(d)(2). However, it is undisputed that Keyes was still an employee of the City when he was required to undergo an FCE. Thus, the propriety of the City's testing requirement in this case is to be considered under the "job-related and consistent with business necessity" standard of § 12112(d)(4). Indeed, Keyes has conceded that the EEOC assessed his charge under the wrong portion of the statute. Plaintiff's Brief in Opposition at 17 n.90.

"job-related and consistent with business necessity" under 42 U.S.C. § 12112(d)(4)(A). In Watson, supra, the United States Court of Appeals for the Eleventh Circuit considered this very issue. There, a police officer was required by his employer to undergo a fitness-for-duty psychological examination, after the officer's supervisor perceived that he was displaying "unusually defensive and antagonistic behavior towards his co-workers and supervisors," and, upon further investigation, the supervisor discovered multiple Internal Affairs investigations and a number of other incidents and grievances involving the officer. Id. at 934. After the officer agreed to be subjected to the examination, it was recommended that he return to work and receive stress management counseling. Id. The officer returned to work eight days later, but he brought suit claiming that his employer violated the ADA by, inter alia, requiring him to have the fitness-for-duty exam, when such was not, he alleged, "job-related and consistent with business necessity," as required by 42 U.S.C. § 12112(d)(4)(A). Id. at 934-35. Affirming the summary judgment against the officer entered by the district court, the Court of Appeals held as follows:

> In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity. Police departments place armed officers in positions where they can do tremendous harm if they act irrationally. Contrary to [the officer's] contention, the ADA does not, indeed cannot, require a police department to forego a fitness for duty examination [or] to wait until a perceived threat becomes real or questionable behavior results in injuries.
>
> The evidence showed the City had good cause for concern as to whether [the officer] was fit to be a police officer. Watson had overreacted in many situations and his colleagues worried he might be paranoid. On this basis, we conclude there is no evidence from which a rational juror could find the City acted improperly by ordering [the officer] to undergo the fitness for duty examination.

Id. at 935.

The Fourth Circuit Court of Appeals reached a similar conclusion in Porter v.

United States Alumoweld Co., 125 F.3d 243 (4th Cir. 1997), a case that in a number of respects bears a striking resemblance to those presented in the instant case. In Porter, the plaintiff was a "BD machine operator," which required him to "occasionally" lift and replace dies weighing up to 15 pounds and pick up stems of wire weighing up to approximately 42 pounds two or three times per shift. Id. at 245. After rupturing a disk in his back in September 1992 and again in October 1993, the plaintiff filed a workers' compensation claim and took a leave of absence. Id. In February 1994, his employer indicated to him that before being allowed to return to work, he would have to provide documentation from his doctors stating that he would have the "sustained physical ability to perform the functions necessary for [his] position . . . ." Id. In April that same year, the plaintiff underwent surgery, and a month later he supplied a note from the surgeon stating that he, the surgeon, had seen the plaintiff and that he was "doing well" and was "able to return to work safely without any limitations." Id. The employer, however, responded to the surgeon that it needed more information in the form of a functional capacity evaluation to determine whether the plaintiff would be physically able to return to work. Id. The employer informed the plaintiff that he would be responsible for the expense of paying the evaluation. However, the plaintiff never underwent the evaluation, and his employment was subsequently terminated. Id. Affirming the summary judgment granted in favor of the employer, the Court of Appeals held that the fitness for duty exam was consistent with the requirements of 42 U.S.C. § 12112(d)(4) given that the plaintiff's job required lifting and pulling and that he had encountered back problems even before his surgery. Id. at 246.

   The Court concludes that there is abundant evidence to support the City's claim that its requirement of a medical examination or inquiry of Keyes was job-related and consistent with business necessity. As a firefighter, Keyes, like the police officer in Watson, would be placed in a position where his inability to fulfill his duties in a critical

situation could result in significant harm, and possibly even death, to himself, his co-workers, or members of the public. Thus, the City's interest in ensuring that he is able to perform the essential functions of the job is obviously sizeable. Moreover, there is no dispute that firefighting is very demanding physically. It is clear from the evidence that the City had a number of significant reasons to doubt whether Keyes would, in fact, be able to return to his former position, despite the presentation of notes from Dr. Morris and Dr. Jones indicating that each then believed Keyes could return to "regular work." First, Keyes had undergone three back surgeries. Second, at the time he presented the doctor notes, Keyes's back condition had caused him to be on leave from active duty for more than 16 months. Third, Dr. Morris and Keyes himself had indicated to the City after his second back surgery that he would not be able to return to firefighting duties because of its demanding physical nature. Fourth, Keyes had taken the position in his workers' compensation case that he was permanently disabled so as to preclude him from working in any type of employment, not just firefighting, which resulted in a finding by the judge in that case that Keyes had a "55% permanent partial disability and loss of ability to earn." And finally, while Doctors Morris and Jones had initially cleared Keyes to resume "regular work" after his third surgery, after being contacted by the City, they both agreed that an FCE was needed to determine whether Keyes did, in fact, have the physical capacity to perform the specific duties required of a firefighter. This evidence is clearly more than enough to show that the City's requirement that Keyes subject himself to an FCE was job-related and consistent with business necessity, pursuant to 42 U.S.C. § 12112(d)(4)(A). Watson; Porter, supra. See also Sullivan v. River Valley School Dist., 197 F.3d 804, 811-12 (6th Cir. 1999); EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089, 1094 (6th Cir. 1998); Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995); Yin v. State of California, 95 F.3d 864, 868 (9th Cir. 1996).

Nonetheless, Keyes argues that his claim should be allowed to proceed to trial

because there is sufficient evidence, he argues, for a jury to find that the City's explanation of why it required him to undergo an FCE is pretextual. Rather than reflecting good-faith doubts about Keyes's ability to perform the essential functions of his job, the FCE was, Keyes alleges, instead merely a discriminatory barrier the City erected with the intention of impeding from returning to work. The Court would agree that if there were sufficient evidence to draw that inference, then summary judgment would be inappropriate. Cf. Martin v. Kansas, 190 F.3d 1120, 1133-34 (10th Cir. 1999) (noting that the plaintiff had "failed to present evidence to rebut the [employer's] written policy that the [disability] disclosure request is intended to gather information to be used in setting post assignments and establishing reasonable accommodations, which are job-related purposes that are consistent with business necessity"); Yin, 95 F.3d at 868 (recognizing that "there is no doubt [the plaintiff's] supervisors' ultimate purpose in requesting a medical examination] was only to determine whether [the plaintiff] was capable of doing her job"); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975) (recognizing in the context of Title VII disparate impact case that even where an employer shows show that its employment testing requirements are "job related," a plaintiff may prevail by showing that the employer was nonetheless using its tests as a pretext for discrimination). The Court concludes, however, that such evidence is not present here.

    In order to show that the FCE requirement was really just a tool employed by the City to discriminate on the basis of disability, Keyes emphasizes three circumstances. First, he points out that the City allowed other firefighters to return to work after back injuries and back surgery without demanding an FCE. The City concedes as much, but there is nothing to indicate that those other firefighters, unlike Keyes, had three surgeries or were on leave for 16 months or that they had taken the position, supported by a doctor and a judicial finding, that they would not ever be able to work as a firefighter again. Thus, the City's treatment of other firefighters is not at all probative on the issue of

pretext. Keyes also makes much of the fact that he presented return-to-work notes from Doctors Jones and Morris on December 5, 1996 and yet the City failed to contact those doctors about clarifying their opinions with regard to Keyes's ability to perform specific firefighting duties until January 28, 1997, and that the City expressed its interest in ending Keyes's employment relationship in connection with offers to settle his workers' compensation claim and any other claims he might have against the City. However, with respect to the delay in contacting Doctors Jones and Morris, Keyes has not presented sufficient evidence to dispute the City's assertion that Chief Bradley immediately decided to recommend obtaining further information from those doctors given Keyes's medical history. Nor has he created an issue of fact regarding the City's assertion that the doctor notes and the recommendation to inquire further had to be and were passed along a chain from Bradley to Karen Higgins in the City's Personnel Department and then to the City's attorney before being acted upon, because of the pendency on appeal of Keyes's workers' compensation claim.[3] Thus, this evidence is at best ambiguous. Given the City's sizeable safety interest in ensuring that its firefighters are fit for duty; the overwhelming evidence

---

[3] Keyes seems to suggest that even if the City could lawfully require him to undergo an FCE before returning him to full duty, the City could not assert such a defense with respect to the time period between January 2, 1997, when Dr. Jones cleared him to return, and February 26, 1997, the date the City actually told him that he had to undergo an FCE. Plaintiff's Brief at 20. Thus, Keyes argues, he still might recover on his ADA discrimination claim for that time period. Id. He cites no authority for this proposition, however. The Court concludes that even if such a theory of liability might be viable under other facts, it is not so here. Keyes ignores (1) that Chief Bradley's recommendation to obtain further information from the doctors had to proceed through personnel and then to the City's attorney before being acted upon because of the pendency of the workers' compensation case and (2) that before actually asking Keyes on February 26, 1997 to undergo an FCE, the City had made numerous inquiries of a number of doctors to determine what action it should take to resolve reasonable doubts about Keyes's physical condition. The Court does not believe that the ADA forces employers who have reasonable doubts about an employee's fitness to choose between only putting an employee into a situation where he might be a danger to himself or others and actually requesting an FCE. Rather, the Court believes that Act allows an employer in such a situation to prevent an employee from returning to work while the employer make reasonable inquiries of medical experts to determine whether an FCE or other testing is, in fact, necessary, as occurred in this case. See, e.g., Porter, supra.

supporting a reasonable belief that Keyes might not be able to physically perform the essential duties of the job; and the fact that the City immediately cleared Keyes to return to his former position, where he still remains, after passing the FCE, the Court concludes that the evidence presented by Keyes does not create a genuine issue of fact as to whether the City was acting on a legitimate basis when it required him to undergo the FCE. Accordingly, the Court concludes that there are no genuine issues of material fact and the City is entitled to judgment as a matter of law. Therefore, the City's motion for summary judgment is due to be granted.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that the City's motion for summary judgment (Doc. No. 14) is due to be GRANTED. Accordingly, this action is due to be DISMISSED, with prejudice.

DONE and ORDERED this 18th day of February, 2000.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE